## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JESSE A. WATSON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06cv00051 |
| | ) | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,**[1] | ) | By: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Jesse A. Watson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

---

[1] Michael A. Astrue became Commissioner of Social Security on February 12, 2007, and is therefore, substituted for Jo Anne B. Barnhart as the defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 2:06-cv-00051-PMS   Document 16   Filed 08/30/07   Page 1 of 18   Pageid#: 78

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Watson protectively filed his application for DIB on December 29, 2003, alleging disability as of June 2, 2003, based on back pain, anxiety, depression, agoraphobia and left leg pain. (Record, ("R."), at 88-90, 96-97, 139.) The claim was denied initially and upon reconsideration. (R. at 64-66, 69, 71-73.) Watson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 74.) The ALJ held hearings on July 28, 2005, and March 21, 2006, at which Watson was represented by counsel. (R. at 23-61.)

By decision dated April 17, 2006, the ALJ denied Watson's claim. (R. at 12-20.) The ALJ found that Watson met the disability insured status requirements of the Act for DIB purposes through September 30, 2008. (R. at 14.) The ALJ found that Watson had not engaged in substantial gainful activity at any time since June 2, 2003. (R. at 14.) The ALJ also found that the medical evidence established that Watson suffered from severe impairments, namely back pain, anxiety and depression, but he found that Watson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-16.) The ALJ found that Watson's allegations were not totally credible. (R. at

15-16.) The ALJ found that Watson retained the residual functional capacity to lift items weighing up to 20 pounds occasionally and less than 10 pounds frequently, stand or walk at least two hours in an eight-hour workday with postural changes, occasionally climb ramps, stairs and ladders and never climb ropes or scaffolds. (R. at 16.) The ALJ also found that Watson had a mild impairment in his ability to interact with co-workers, supervisors and the public and to respond appropriately to work pressures. (R. at 16.) Thus, the ALJ found that Watson was unable to perform his past relevant work. (R. at 18.) Based on Watson's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Watson could perform jobs existing in significant numbers in the national economy. (R. at 19.) Thus, the ALJ found that Watson was not disabled under the Act and was not eligible for benefits. (R. at 19-20.) *See* 20 C.F.R. § 404.1520(g) (2007).

After the ALJ issued his decision, Watson pursued his administrative appeals, (R. at 8), but the Appeals Council denied his request for review. (R. at 4-6.) Watson then filed this action seeking review of the ALJ's unfavorable decision, which now stands at the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2007). This case is before the court on Watson's motion for summary judgment filed February 21, 2007, and the Commissioner's motion for summary judgment filed March 21, 2007.

## II. Facts

Watson was born in 1979, (R. at 42, 88), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Watson has a tenth-grade education[2] and past work experience as a cashier, a customer service representative, a farm hand, a sales

---

[2]On his Disability Report, Watson reported that he had completed one year of college. (R. at 104.)

-3-

associate, a security guard and a waiter. (R. at 42, 98, 130.)

Watson testified that he was disabled due to back pain. (R. at 46.) He stated that he had difficulty bending. (R. at 48.) Watson stated that he could stand for up to 15 minutes without interruption. (R. at 49.) He stated that he could sit for up to 20 minutes without interruption and that he could lift and carry items weighing up to 10 pounds. (R. at 49-50.) Watson stated that he suffered from anxiety attacks, panic attacks and severe depression. (R. at 52.) He stated that he was taking medication for his symptoms and that the medication was helping. (R. at 52.) He stated that he experienced side effects from the medication such as short-term memory loss, fatigue and drowsiness. (R. at 52.)

Dr. Edward L. Griffin, M.D., a medical expert, also testified at Watson's hearing. (R. at 25-28.) Dr. Griffin stated that Watson could lift items weighing up to 25 pounds. (R. at 26.) He stated that Watson had no limitations in the use of his extremities, and that he had no limitations in his ability to sit, stand and walk. (R. at 26.) Dr. Griffin stated that Watson could frequently bend, stoop and squat. (R. at 26.) Dr. Griffin stated that there was insufficient evidence in the record to support a finding that pain interfered with Watson's ability to maintain attention and concentration. (R. at 27-28.)

Thomas Edward Schacht, Ph.D., a medical expert, testified at Watson's hearing. (R. at 28-35.) Schacht stated that Watson had been treated for symptoms of anxiety and depression with some positive response to treatment. (R. at 28.) He stated that Watson's complaints had fluctuated significantly in relation to life's circumstances and life stressors, particularly a relationship with a boyfriend. (R. at 28-29.) Schacht

-4-

pointed out that Watson had complained of severe memory impairment, which he attributed to his medication. (R. at 29.) He also stated that Watson's medications were not changed and that there was no evidence that Watson's physician even addressed short-term memory loss. (R. at 29.) Schacht pointed out that Donald G. Hires, Ph.D., a clinical psychologist, mistakenly diagnosed Watson with a gender disorder; therefore indicating that it was possible that Hires made other errors as well. (R. at 30, 34.) Schacht stated that IQ testings were effort-based, making it possible for a person to obtain a lower IQ score by not putting forth effort. (R. at 35.)

Donna Bardsley, a vocational expert, also was present and testified at Watson's hearing. (R. at 35-37.) Bardsley was asked to consider a hypothetical individual of Watson's age, education and IQ, who had the residual functional capacity to occasionally lift items weighing up to 20 pounds and frequently lift items weighing less than 10 pounds, who could stand and/or walk two hours in an eight-hour workday, who could not climb ropes or scaffolds and could occasionally climb ramps, stairs and ladders, who had a slight impairment with his ability to interact with the public, supervisors and co-workers and who had no ability to respond to work pressures and appropriate changes in the work setting. (R. at 36.) Bardsley testified that such an individual could perform jobs that existed in significant numbers in the national economy, including those of a hand packager, a sorter, an assembler, an inspector, an information clerk, an order clerk and a cashier. (R. at 36.) When asked if the individual had a seriously limited ability to maintain attention and concentration, to deal with co-workers, supervisors and work stresses, Bardsley stated that there were no jobs available that such an individual could perform. (R. at 37.)

In rendering his decision, the ALJ reviewed medical records from Dr. Ugwuala

Nwauche, M.D.; Dr. Paul C. Peterson, M.D.; Wellmont Lonesome Pine Hospital; Wellmont Rehabilitation Services; Wise County Behavioral; Frontier Health; Donald Hiers, Ph.D., a clinical psychologist; Dr. Samuel D. Breeding M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Richard M. Surrusco, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; and Cumberland Valley District Health Department.

Watson's medical records indicate that his alleged back injury occurred in January 2002 after he fell down steps. (R. at 151-52, 157.) In September 2002, Watson saw Dr. Ugwuala Nwauche, M.D., for complaints of back pain. (R. at 179-80.) Dr. Nwauche reported that the cause of Watson's back discomfort was unclear. (R. at 180.) On October 9, 2002, Dr. Nwauche reported that Watson exhibited no neurologic deficits, and he displayed full range of motion in his extremities. (R. at 177.) On March 14, 2003, an MRI of Watson's lumbar spine suggested evidence of disc desiccation at the L4-L5 level with a moderate diffuse bulging of his annulus fibrosus. (R. at 192.) On December 11, 2003, Watson complained of being violent, depressed and very anxious. (R. at 169.) He reported that he felt like he wanted to hurt someone. (R. at 169.) Dr. Nwauche diagnosed anxiety disorder, major depression and chronic back pain. (R. at 169.)

In February 2005, Dr. Nwauche completed a medical assessment indicating that Watson could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 181-82.) He indicated that Watson could stand, walk and/or sit for three to four hours in an eight-hour workday, and that he could do so for 30 minutes to one hour without interruption. (R.

-6-

at 181.) He indicated that Watson could occasionally stoop, kneel, crouch and crawl. (R. at 182.) Dr. Nwauche indicated that Watson's ability to push and pull was limited. (R. at 182.)

In February 2005, Dr. Nwauche also completed a mental assessment indicating that Watson had a more than satisfactory ability to understand, remember and carry out simple instructions, to maintain personal appearance and to demonstrate reliability. (R. at 183-84.) He indicated that Watson had a limited, but satisfactory, ability to follow work rules, to function independently, to understand, remember and carry out detailed instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 183-84.) Dr. Nwauche indicated that Watson had a seriously limited, but not precluded, ability to relate to co-workers, to use judgment, to interact with supervisors, to maintain attention/concentration and to understand, remember and carry out complex instructions. (R. at 183-84.) He also indicated that Watson had no useful ability to deal with the public and to deal with work stresses. (R. at 183.) The record shows that Watson continued to treat with Dr. Nwauche through December 2005 for complaints of chronic back pain, major depression and an anxiety disorder. (R. at 368.)

On September 24, 2002, and October 6, 2002, Watson presented to the emergency room at Wellmont Lonesome Pine Hospital for complaints of back pain. (R. at 149-59.) X-rays of Watson's lumbar spine were normal. (R. at 159.) Straight leg raising tests were negative. (R. at 151.) Watson's judgment and insight were normal. (R. at 151.) In June 2004, Watson complained of back pain and was diagnosed with chronic back pain. (R. at 289-90.) In October 2005, Watson presented to the emergency room with complaints of injuries to his head and left arm after falling at

-7-

Wal-Mart. (R. at 394-95.) X-rays of Watson's left hip showed a probable old fracture of the femoral neck. (R. at 396.) X-rays of Watson's lumbar spine were normal. (R. at 397.) Watson's mood and affect were normal. (R. at 394.) Watson was diagnosed with acute exacerbation of chronic low back pain and left wrist and hip pain. (R. at 395.)

In May 2003, Margaret R. Gibson, M.P.T., performed an initial physical therapy evaluation upon Dr. Nwauche's referral. (R. at 199-200.) Gibson reported that Watson exhibited "slight" radicular pain into his left lower extremity with no significant weakness. (R. at 199.) It appears that Watson attended only one follow-up physical therapy session. (R. at 199-201, 288.) At this session, Watson was observed doing well with the physical therapy exercise regimen. (R. at 288.)

In May 2003, Dr. Paul C. Peterson, M.D., evaluated Watson for his complaints of left lower extremity pain and back pain. (R. at 194-98.) Dr. Peterson reported that Watson was in no acute distress and that his gait was nonantalgic. (R. at 196.) Examination of Watson's upper and lower extremities was within normal limits. (R. at 196.) Straight leg raising tests were negative, and reflexes were intact. (R. at 196.) His muscle strength and tone were normal. (R. at 196.) Watson's mood and affect were appropriate. (R. at 197.) Dr. Peterson reviewed the results of Watson's March 2003 MRI and determined that it showed disc degeneration at the L4-L5 level with a central minimal disc protrusion that had not impinged upon his nerve root. (R. at 197.) Dr. Peterson diagnosed lumbar herniated nucleus pulposus at the central L4-L5 level with no evidence of nerve root compression, chronic low back pain and lumbar degenerative disc disease at the L4-L5 level. (R. at 197.) Dr. Peterson recommended conservative treatment and told Watson that he could continue working. (R. at 197-

-8-

98.)

The record shows that Watson was treated at Wise County Behavioral Health for depression and anxiety from February 2004 through December 2005. (R. at 202-59, 293-308, 329-36, 373-93.) In February 2004, Dr. Randall Pitone, M.D., a psychiatrist, evaluated Watson. (R. at 228-30.) Dr. Pitone reported that Watson was alert and oriented. (R. at 229.) He reported that Watson seemed moderately depressed and anxious. (R. at 229.) Watson's memory and cognitive functions were intact. (R. at 229.) Dr. Pitone diagnosed a panic disorder with mild agoraphobia, a social anxiety disorder and a single episode major depressive disorder. (R. at 230.) Dr. Pitone indicated that Watson had a then-current Global Assessment of Functioning, ("GAF"),[3] score of 50[4] to 55.[5] (R. at 230.) In April 2004, Watson reported that he was feeling better overall and that his medications were working. (R. at 221.) He reported that he felt less depressed and less anxious. (R. at 221.) He related his depressive symptoms to situational stressors, particularly issues with his boyfriend. (R. at 221.) In June 2004, Watson reported that his medications were working well. (R. at 218.) In September 2004, Watson reported that his medications were working well. (R. at 208.) In October 2004, Watson reported that his medication were helpful and that he tolerated them well. (R. at 202-04.) Dr. Pitone reported that there was no evidence of

_____

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[4]A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

[5]A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

-9-

adverse affects of medications. (R. at 203.) In January 2005, Watson reported that he was doing okay. (R. at 294.) It was reported that Watson was stable. (R. at 294.) Watson continued to report that he was doing well on medication, and he continually denied experiencing any side effects. (R. at 373, 375, 379, 383, 387, 389.)

On August 9, 2004, Dr. Frank M. Johnson, M.D., a state agency physician, indicated that Watson had the residual functional capacity to perform medium work.[6] (R. at 260-67.) Dr. Johnson indicated that Watson could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 263.) No manipulative, visual or communicative limitations were noted. (R. at 263-64.) He indicated that Watson should avoid all exposure to work hazards, including machinery and heights. (R. at 265.) This assessment was affirmed by Dr. Richard M. Surrusco, M.D., another state agency physician, on November 17, 2004. (R. at 267.)

On August 9, 2004, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Watson suffered from an affective disorder and an anxiety-related disorder. (R. at 268-83.) She indicated that Watson had a mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 278.) Hamilton also indicated that Watson had experienced no episodes of decompensation. (R. at 278.) Hamilton indicated that Watson would have difficulty coping with high-stress jobs or jobs that required extensive contact with the public. (R. at 280.) These findings were affirmed by E.

---

[6]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2007).

-10-

Hugh Tenison, Ph.D., another state agency psychologist, on November 17, 2004. (R. at 268.)

Hamilton also completed a mental assessment indicating that Watson was moderately limited in his ability to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to respond appropriately to changes in the work setting. (R. at 284-86.) In all other areas of functioning, Watson was found to be not significantly limited. (R. at 284-85.) She indicated that Watson's social skills were adequate for nonstressful work. (R. at 286.) This assessment was affirmed by Tenison on November 17, 2004. (R. at 286.)

On September 5, 2005, Donald G. Hiers, Ph.D., a clinical psychologist, evaluated Watson. (R. at 357-64.) Hiers reported that Watson's appearance was clean, he was calm and he maintained a "strong" eye contact. (R. at 357.) Watson admitted to a history of mixed substance abuse involving alcohol, acid and marijuana. (R. at 359.) Watson reported that he had suicidal ideation up to three times weekly, but Hiers reported that this appeared to be an "overstatement." (R. at 358.) Watson reported that his therapy sessions helped and that his medication reduced his anxiety and panic attacks. (R. at 360.) Hiers reported that Watson's concentration and attention were "slightly inferior." (R. at 360.) The Wechsler Adult Intelligence Scale-Third Edition,

-11-

("WAIS-III"), test was administered, and Watson obtained a verbal IQ score of 82, a performance IQ score of 69 and a full-scale IQ score of 74, placing him in the lower limits of the borderline rage of intelligence. (R. at 361.) On the Minnesota Multiphasic Personality Inventory-Second Edition, ("MMPI-2"), test  Watson's validity T scores were exceedingly high above a T score of 120, which indicated "faking bad severe pathology," resulting in possibly invalidity of the scales.  (R. at 362.) Hiers also reported that the K scale indicated that Watson also "faked bad," which suggested an invalid protocol. (R. at 362.) Hiers diagnosed dysthymia, a generalized anxiety disorder, a gender identity disorder and a personality disorder, not otherwise specified. (R. at 363.) He assessed Watson's GAF score at 60.  (R. at 363.) Hiers reported that Watson's reported limitations were probably voluntary and were related to physical problems and to impatience.  (R. at 363.)

Hiers completed a mental assessment indicating that Watson had no limitation in his ability to understand, remember and carry out instructions and to respond appropriately to change in a routine work setting. (R. at 365-67.) He indicated that Watson had mild limitations in his ability to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers and to respond appropriately to work pressures in a usual work setting.  (R. at 365-66.)

On October 3, 2005, Dr. Samuel D. Breeding, M.D., examined Watson for his complaints of back pain, anxiety, depression and agoraphobia.  (R. at 348-52.) Dr. Breeding reported that Watson's gait and station were normal.  (R. at  350.)  Muscle strength was normal in all major muscle groups. (R. at 350.) Dr. Breeding diagnosed low back pain with MRI evidence of moderate diffuse bulging at the L4-5 discs and a history of anxiety and depression.  (R. at 351.)

-12-

Dr. Breeding completed a medical assessment indicating that Watson could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing less than 10 pounds. (R. at 353-56.) He indicated that Watson could stand and/or walk two hours in an eight-hour workday. (R. at 353.) Dr. Breeding indicated that Watson could sit for six hours in an eight-hour workday, and that he was limited in his ability to push and/or pull with both the upper and lower extremities. (R. at 354.) He indicated that Watson could occasionally climb ramps, stairs and ladders and never climb ropes and scaffolds. (R. at 354.) He indicated that Watson could occasionally balance, kneel, crouch, crawl and stoop. (R. at 354.) Dr. Breeding did not find that Watson had any manipulative, visual, communicative or environmental limitations. (R. at 355-56.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the

-13-

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall v. Harris*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 17, 2006, the ALJ denied Watson's claim. (R. at 12-20.) The ALJ found that the medical evidence established that Watson suffered from severe impairments, namely back pain, anxiety and depression, but he found that Watson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-16.) The ALJ found that Watson retained the residual functional capacity to lift items weighing up to 20 pounds occasionally and less than 10 pounds frequently, stand or walk at least two hours in an eight-hour workday with postural changes, occasionally climb ramps, stairs and ladders and never climb ropes or scaffolds. (R. at 16.) The ALJ also found that Watson had a mild impairment in his ability to interact with co-workers, supervisors and the public and to respond appropriately to work pressures. (R. at 16.) Thus, the ALJ found that Watson was unable to perform his past relevant work. (R. at 18.) Based on Watson's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Watson could perform jobs existing in significant numbers in the national economy. (R. at 19.) Thus, the ALJ found that Watson was not disabled under the Act and was not eligible for benefits. (R. at 19-20.) *See* 20 C.F.R. § 404.1520(g) (2007).

-14-

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Watson argues that the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Nwauche. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-9.) Watson also argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 9-12.)

The ALJ found that Watson retained the residual functional capacity to lift items weighing up to 20 pounds occasionally and less than 10 pounds frequently, stand or walk at least two hours in an eight-hour workday with postural changes, occasionally climb ramps, stairs and ladders and never climb ropes or scaffolds. (R. at 16.) Watson argues that the ALJ erred by failing to give controlling weight to the opinion of his treating physician, Dr. Nwauche. (Plaintiff's Brief at 6-9.) Under 20 C.F.R. § 404.1527(d), the ALJ must give controlling weight to a treating source's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. The ALJ gave little weight to the assessments of Dr. Nwauche because they were inconsistent with and unsupported by the objective medical evidence of record. (R. at 18.) Based on my review of the record, I find that substantial evidence exists to support this finding.

The ALJ relied on the assessment of Dr. Breeding in determining Watson's physical residual functional capacity. (R. at 16.) Dr. Breeding found that Watson had 5/5 motor strength and normal coordination. (R. at 350.) Dr. Peterson, a neurologist, examined Watson and found that he had only mild L4-L5 disc degeneration with no evidence of direct nerve root compression or a disc herniation. (R. at 192, 197.) Dr. Peterson recommended conservative treatment and opined that Watson could work. (R. at 198.) Watson's most recent diagnostic study of his lumbar spine revealed that he had normal alignment of his vertebral bodies, no abnormalities in his vertebral bodies or intervertebral disc spaces, unremarkable pedicles, transverse and spinous processes, normal osseous and soft tissue structures and no sponylolysis or spondylolisthesis. (R. at 397.) The record shows that Watson's sensory exam was

normal, (R. at 351), he had no specific muscle group weakness, (R. at 196), he had full muscle strength, (R. at 196, 199, 350, 394), with normal tone and no atrophy, (R. at 196), his reflexes were intact and straight leg raising tests were normal. (R. at 151, 197, 199, 350.) Furthermore, Dr. Griffin testified that Dr. Breeding's limitations were credible when the entire record was taken into account. (R. at 26.)

The ALJ also found that Watson had a mild impairment in his ability to interact with co-workers, supervisors and the public and to respond appropriately to work pressures. (R. at 16.) Based on my review of the record, I find that substantial evidence exists to support this finding. The ALJ relied on psychologist Hiers's assessment in making this finding. (R. at 16.) While the state agency psychologists found that Watson had moderate limitations in various work-related abilities, the ALJ rejected these assessments because new and material evidence was received subsequent to their findings, and, thus were not supported. (R. at 18.) The record shows that Watson reported on numerous occasions that his medications were working well and that he had not experienced any side effects from the medications. (R. at 202-04, 208, 218, 221, 373, 375, 379, 383, 387, 389.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Based on this, I find that substantial evidence exists to support the ALJ's finding with regard to Watson's residual functional capacity.

For all of these reasons, I find that substantial evidence exists to support the ALJ's rejection of Dr. Nwauche's assessment and that substantial evidence exists to support the ALJ's finding with regard to Watson's residual functional capacity.

-17-

*IV. Conclusion*

For the foregoing reasons, Watson's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted  and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:     This 30th day of August 2007.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE